UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

EUGENE SPENCER                                              PLAINTIFF

     vs.                                   Civil Action No: 1:04cv752-LG-RHW

JO ANN BARNHART, Commissioner                              DEFENDANT
of Social Security Administration

## PROPOSED FINDINGS OF FACT AND RECOMMENDATION

Eugene Spencer seeks judicial review of the final decision of the Commissioner of Social

Security (Commissioner) denying his claim for disability insurance benefits for a claimed period

of disability from September 19, 1998 to January 8, 2003.  Spencer contends the Commissioner

failed to properly evaluate his complaints of pain, misapplied the law in evaluating his medical

impairments and failed to establish Plaintiff's residual functional capacity.

## Procedural History and Factual Background

On August 15, 2002, Eugene Spencer applied for disability insurance benefits, claiming

disability due to back and leg problems.  Following denial of his application initially and on

reconsideration, Spencer requested an administrative hearing.  [T. 35]  Administrative Law Judge

Wallace E. Weakley heard the matter on February 12, 2004, taking testimony from Spencer and

vocational expert Charles Miller.  Spencer was represented by counsel at the hearing. [T. 39-69]

The administrative decision entered June 16, 2004 denied benefits based on findings from review

of the medical record and other evidence that Spencer is capable of performing a number of jobs

existing in the national and local economies, and therefore is not disabled as defined by the

Social Security Act.  [T. 12-22]  On August 6, 2004, the Appeals Council denied Plaintiff's

request for review of Judge Weakley's decision.  [T. 3-7]  Spencer timely appealed to this Court

on October 4, 2004, and the case is ripe for review under 42 U.S.C. § 405(g).

**Claimant's Personal History**

At the time of the alleged onset disability on September 19, 1998, Spencer was age forty-

three.  He was forty-nine at the time the Administrative Law Judge rendered the decision of

which he complains.  [T. 21]  Spencer is married and lives with his wife in Bay Saint Louis,

Mississippi.  His then seven-year-old child from a previous marriage was living with Spencer's

ex-wife.  Spencer has a high school general equivalency diploma (GED); he served in the Army

from 1971-73, and completed six months of college when he got out of the military.  [T. 43-45]

Roofing was Spencer's primary occupation after he moved to Phoenix, AZ in 1981.  He

was last employed as a urethane foam roofer for Brown Brothers Roofing in Phoenix until

September 1998 when he injured his back moving 55-gallon drums of the spray-on roofing

material.  [T. 45-46]  He testified he has disks "blowed out" on both sides, but has been told by

doctors in Arizona and Mississippi that surgery would not likely help.  He has had a spinal

stimulator implanted since September 2002.  Spencer received workers' compensation benefits

for a period of time, and testified his workers' compensation claim was still pending in Phoenix.

A functional capacity examination in January 2003 indicated he could return to light work.

Spencer said he looked for work all around Waveland and Kiln, stopping by stores, asking if they

were hiring, but he has not attempted to work at any time since 1998.  His wife works. [T. 47-49]

Spencer usually rises between 5:00 and 7:00 a.m. each day,  has coffee and feeds the

dogs.  Then he lies down and naps or sits in a recliner for three to six hours a day.  [T. 59]  He

bathes and dresses himself, cooks, and occasionally sweeps, vacuums and mops.[1]  He cooks

dinner and feeds the dogs again in the evening.  He does not carry out trash, help with laundry, or

do any yard work or gardening.  He does the stretching exercises he was told to do, but is now

unable to play golf or racquetball.  [T. 52-54]  He can drive and has a valid drivers license.  [T.

44, 45].  He drove himself to the hearing, periodically drove to his doctors appointments, and

once drove to see his brother in Atlanta.  [T. 44- 45, 54].  He goes to sleep between 12:00 and

2:00 a.m.  [T. 52-54]

      Spencer estimates that after September 1998 he could walk only 100 feet before having to

stop and sit down due to pain in his back and down his legs.  He could stand 30 minutes to an

hour at a time, could bend down to pick up things off the floor,[2] and could sit in an office-type

chair for 45 minutes to an hour at a time.   [T. 54-55]  Lifting more than ten pounds caused pain,

though he could probably carry 10-15 pounds in a work setting.  He said his doctors limited

lifting to ten pounds continuously, twenty pounds occasionally.[3]  He can push, pull, open and

close doors, but cannot stoop or squat, and does not know if he could climb stairs because he has

never tried.  Epidural injections were of little help, and Spencer claims he could not perform even

sedentary work after September 1998 because of pain.  [T. 54-58]  Even with medication his pain

was still a 6-7 on a scale of 10 until the stimulator was implanted.  [T. 61]

---

[1]He worked for 10-20 minutes then sat/rested 15-30 minutes, frequently changing positions.  [T. 61-62]

[2]Spencer stated he had to bend from the waist because knee problems prevented him from bending his knee or kneeling. He says he needs a knee replacement.  [T. 55]  Motorcycle accidents when Spencer was in his twenties required facial reconstruction and surgery on both knees [T. 120, 136]. The knee problem was worse in 2001 or 2002 when he was seeing Dr. Chen, and had improved as of the hearing date. [T. 59-60]

[3]Spencer clarified this as a restriction imposed by Dr. Winters when he released Spencer to return to work in 2003.  Spencer does not recall anyone placing any restrictions on him before that time. [T. 58]

**Medical Evidence**

      The Administrative Judge noted that Spencer's principal doctors were Dr. Goldberg, Dr. Steingard, Dr. White, Dr. Chen and Dr. Winters.  The medical records show chiropractor Michael Lichtman referred Spencer to Dr. Paul Steingard, D.O., for consultation.  Dr. Steingard saw Spencer October 13, 1998.  His examination showed Spencer could heel and toe walk, forward flex to approximately 90 degrees, side bend left and right to 45 degrees, and hyperextend 25 degrees.  He had active and equal patellar reflexes, somewhat diminished Achilles reflexes which appear to be absent on the left.  Straight leg raising from a supine position was negative, and from a sitting position caused pain.  Dr. Steingard diagnosed lumbosacral strain and lumbar radiculopathy.  [T. 131]  An October 21, 1998 MRI showed multilevel disc disease with central to left paracentral protrusion at L3-4 which did not significantly displace or efface the nerve root, marked dessication of the L4-5 disc with loss of height and herniation of the disc which could affect the L5 nerve root, and dessication of the L5-S1 disc with central protrusion.  [T. 129-130]  Dr. Steingard suggested epidural injections and recommended a neurologic consultation.  The epidural injections reportedly gave minimal relief.  [T. 128, 126]

      On November 6, 1998, Spencer saw neurologist Dr. George Goldberg, who noted that Spencer had improved on a program of hot packs and ultrasound, but still had pain in his back radiating to the left hip, particularly with activity.  Dr. Goldberg noted the several levels of protrusion and herniated disk at the L4-5 level, and recorded that Spencer "denies the use of medications."  [T. 120]  Dr. Goldberg's neurological evaluation showed Spencer to be mentally alert, awake, attentive, with fluent speech.  He had mild muscle spasms in his neck, but full range of motion; motor examination showed good bulk, tone, and strength throughout, a decreased

strength in dorsiflexion in the left great toe, and normal gait and station.  [T. 121].  On forward

flexion, Spencer complained of pain at approximately 60 degrees.  Dr. Goldberg prescribed

ibuprofen 600 mg three times a day, and Valium 5 mg at bedtime.  [T. 121]

On January 4, 1999, when neurosurgeon Dr. William White evaluated him, Spencer's leg

pain had been gone for approximately a month, and would recur for up to a day when he lifted

something, but then resolved with limited activity.  Spencer still had left back pain. Dr. White's

neurological examination revealed motor intact in both legs, pinprick suppressed in the left foot,

deep tendon reflexes 1+ and equal in knee jerks and ankle jerks, and posterior tibial jerks trace

and equal.  Position and vibratory senses were intact.  In the supine position, Spencer's hip and

knee flexion and external rotation were moderately limited on the left but not limited on the

right.  Spencer could perform straight leg raising to approximately seventy degrees bilaterally

before developing back pain, but no leg pain.  He could support his weight on his heels and toes,

and his tandem gait, Romberg, and point-to-point testing were performed well.  Dr. White's

impression was back and left leg pain suggestive of mild lumbar radiculopathy, possibly

secondary to herniated discs at L3-4 and/or L4-5.  [T. 135-137]

On her January 8, 1999, evaluation of Spencer, physical therapist Maureen Storer noted

that Spencer reported the pain is now only in his lower back, but any physical activity created

pain in his hip.  He rated his pain as being a four to five on a scale of ten.  Storer reported, "He is

not having any difficulties with his normal activities of daily living..." [T. 123-124].

Dr. White saw Spencer again on April 22, 1999.  Spencer reported that conservative

treatment and epidural injections had not helped, and he believes he cannot return to roofing.  He

told Dr. White he had been learning about computers, and hoped to return to work as an

5

inspector or some other construction-related job.  Spencer complained at this visit that he had developed right leg pain, as well as left leg pain, and continued to have back pain, with numbness and tingling across his left foot toes, but no weakness in the legs.  Neurological examination revealed few changes:  deep tendon reflexes 2+ and straight leg raising on the left to approximately eighty degrees caused pain, but straight leg raising was negative on the right at eighty degrees.  Dr. White's impression remained essentially unchanged.  [T. 135-138]

A repeat MRI on May 10, 1999 demonstrated disc protrusions at L3-4, L4-5, and L5-S1, the worst being at L4-5, though it was noted to have "decreased somewhat in size when compared to the study of 10/21/1998..."  Lumbosacral spine x-rays dated May 11, 1999 demonstrated normal alignment, stable on flexion and extension.  Dr. White advised Spencer that the chance of pain relief with surgery was at best 50-50, and there was a significant chance it would make his pain worse. [T. 134, 139-141]

On November 29, 1999, Dr. Anthony Yeung examined Spencer on referral by Spencer's attorney.  [T. 142]  Dr. Yeung noted Spencer's complaints of back, hip and leg pain, and recorded that "he takes no medications."  Dr. Yeung's examination revealed a full range of motion of the lumbar spine with increased pain with flexion and extension.  Spencer could walk on his toes and heels.  DTRs +1/2 at the bilateral patellar and Achilles tendons; motor strength 5+/5, sensory exam is intact and straight leg raising exams are negative.  Dr. Yeung recommended "provocative diskography at L3-S1."  [T. 142-143]

From January 1, 2000 to September 9, 2002, Spencer was treated at the Veterans Affairs Hospital (VA) [T. 162-186, 242-253], primarily for complaints of right knee pain, but also occasional complaints about his back, wrist, and elbow.  [T. 179, 180, 181, 184]  An MRI taken

at the VA revealed a large popliteal cyst on Spencer's right knee, degenerative arthritis, and patello-femoral dislocation.  [T. 17, 176].  During treatment at the VA, Spencer was noted to be on no medications on January 22, 2002.  [T. 182-183]  He reported having worked a lot in the yard at his April 8, 2002 visit [T. 174-175],  and at his May 1, 2002 appointment, he stated he had put three raised gardens in at his house the past weekend.  [T. 171]

On September 12, 2000, Spencer saw Dr. Charles Winters for persistent complaints of low back pain and ongoing left leg pain, which had improved with Celebrex, but Spencer wanted something more done.  Dr. Winters found no restriction of hip motion or knee motion on either side and no abnormal pain with range of motion; and normal stability, muscle strength and motor tone of his legs.  Deep tendon reflexes were 1+ at his knee jerks and ankle jerks bilaterally.  His sensory examination was decreased to pinwheel testing on the left, and normal on the right.  [T. 157].  Dr. Winters agreed there was only a small chance that surgery would markedly improve his condition.  [T. 156]

Spencer saw Dr. Winters again on February 21, 2001 because his workman's compensation carrier had requested an update on his work status.  Dr. Winters did not think at that point that he was capable of returning to work.  [T. 156]  On November 14, 2001, Dr. Winters recommended repeat diagnostic studies, and a December 17, 2001 MRI showed minimal degenerative spondylotic displacement effacing the ventral dural sac at T11-12 and T12-L1; L1-2 and L2-3 were normal; L3-4 showed a noncompressive disc bulge with bilateral foraminal narrowing , but no foraminal central stenosis, no high-grade neural compression and no HNP. There was disc dessication at L4-5 with mild bilateral facet arthropathy in combination with disc bulge slightly eccentric to the left resulting in mild central and left foraminal stenosis, annular

rent, but no high grade neural compression and no HNP.  There was also disc dessication at L5-S1 with disc bulge eccentric to the right, bilateral facet arthropathy resulting in bilateral foraminal encroachment, right slightly greater than left, but no high-grade neural compression or HNP and no central stenosis.  [T. 159-160]  Dr. Winters stated, "None of these are overtly bad. L4-5 appears to be the worse and still only mild to moderately narrowed.  There is no isolated herniation that I can identify."  [T. 154]  On January 18, 2002 Dr. Winters felt a spinal cord stimulator might relieve Spencer's symptomatology, and referred him back to Dr. Chen at Sun Coast Pain Management Center for that purpose.  [T. 153]

Dr. Joe Chen first saw Spencer on October 26, 2000.  [T. 227]  Spencer stated he had burning, constant, sharp shooting pain, which he rated at 6/10 that day.  He was taking Celebrex twice daily at that time.  He reported that chiropractic treatment, epidural injections and physical therapy gave no relief.  Spencer told Dr. Chen the majority of his pain was "is in his feet and he has some pain in his back."  Dr. Chen reviewed the MRI studies, and assessed Spencer with lumbar discogenic disease, lumbar spondylosis, lumbar radiculopathy, and possible sacroiliac joint pain.  [T. 227-228]  On November 28, 2000, Dr. Chen performed a selective nerve root block on the left side.  [T. 225]  Dr. Chen performed additional transforaminal epidural steroid injections on December 14, 2000 [T. 224], and January 23, 2001.  [T. 222]

Spencer reported on February 19, 2001 that the injections had not helped and rated his pain 6/10.  Dr. Chen scheduled him for lumbar discography [T. 221], which he performed on March 26, 2001.  [T. 218-220]  The discography showed positive discogenic changes at L3-4, L4-5 and L5-S1.  Spencer stated M.S. Contin was helping with his pain (rated at 5/10 on April 9, 2001).  Dr. Chen discussed possible surgery or dorsal column stimulation.  [T. 217]  Spencer

told Dr. Chen on April 30, 2001, he did not want to do the spinal cord stimulation or have surgery.  He stated the M.S. Contin continued to help with pain (still rated at 5/10 on this visit). Dr. Chen thought physical therapy might be an option.  [T. 215]  On July 2, 2001, Spencer reported  M.S. Contin was still helping with his pain, but he was concerned with continuing to take Celebrex because of news he had seen about lawsuits filed over adverse affects of the drug. [T. 214]  On August 6, 2001, Spencer rated his pain at 8/10, and Dr. Chen refilled prescriptions for morphine and Celebrex.  [T. 212]  Dr. Chen discontinued the Celebrex following an August 21, 2001 phone call from Spencer complaining of pain and swelling in his knee and calf.   Dr. Chen told him to go to the emergency room to be checked for a possible blood clot.  [T. 213]

On January 28, 2002, Spencer told Dr. Chen he was ready to try a spinal cord stimulator. [T. 206]  However, he did not return to Dr. Chen until May 13, 2002, at which time the stimulator was again discussed.  [T. 205]  The procedure for a trial of the stimulator was performed July 19, 2002 [T. 203-203], which provided excellent pain relief in his leg, almost 90% relief of pain in his foot.  Dr. Chen scheduled him for a permanent implant [T. 201-202], which was performed on September 17, 2002 [T. 197-199], with very good results.  [T. 196]

From February 21, 2002 to April 23, 2002, Dr. Jonathan Cole, a clinical psychologist, saw Spencer for treatment of adjustment disorder with mixed anxiety, depressed mood and pain disorder.  Dr. Cole taught him the basics of pain psychology, diaphragmatic breathing and autogenic relaxation, and Spencer stated he had almost no pain and significant tension reduction. Dr. Cole instructed him to practice this daily and to practice reducing his pain behaviors as much as possible.  [T. 260]  Spencer told Dr. Cole his pain was increased with physical activity, but that stress has no effect on the pain, and he was having no sleep problems.  [T. 258]  On April

23. 2002, Dr. Cole reported that Spencer was able to reduce his right lumbar paraspinal pain to the normal range using relaxation, and did not need to return to the clinic for psychological treatment of his pain.  [T. 255]

On December 2, 2002, Dr. Chen reported that Spencer was doing "quite well" with the stimulator.  Spencer had been fishing and riding on a boat in choppy waters and was having some residual back pain as a result.  He was on no pain medications.  [T. 263]  On April 16, 2003, Dr. Winters reported significant improvement in Spencer's back pain since implantation of the stimulator, and released him to return to work with restrictions to limit standing to three hours a day, sitting to six hours a day, and walking to three hours a day; lifting and carrying up to 10 pounds frequently, 20 pounds occasionally.  Winters said Spencer can climb frequently, bend frequently, kneel and use hands and feet repetitively on a continuous basis, but could stoop or squat only occasionally.  [T. 265]

A functional capacities evaluation performed January 8, 2003, indicated Spencer was capable of performing light work, despite his failure to give maximum effort during the evaluation.  [T. 268]

**Vocational Evidence**

Vocational Expert Charles Miller stated the DOT classifies Spencer's past relevant work duties as a foam roofer as skill level 6, requiring  light exertion, but stated the DOT description did not refer to moving 55-gallon drums of the urethane which, unless accomplished with a forklift, would make this a heavy level job.  [T. 63].  Based upon the hypothetical including Spencer's age, education and vocational history, the fact that he has low back problems due to a bulging disk which require a sit/stand option, his ability to sit for 45 minutes to an hour and stand

for 30 minutes to an hour, with limited walking but no bending, kneeling, stooping, climbing or reaching overhead, Miller testified Spencer could work as a telephone solicitor (1,400 jobs in Mississippi and 88,000 jobs in the United States), a cashier at a self-service gas station (1,000 jobs in Mississippi and 110,000 jobs in the United States), and as a parking lot cashier (960 in Mississippi and 20,000 jobs in the United States).  [T. 64]  In response to a second hypothetical based on the same facts with added conditions requiring the claimant to lie down periodically during the day due to pain, with breaks more often than 15 minutes in the morning and afternoon, and a lunch break, Miller testified there would be no available jobs.  [T. 65].  On cross-examination, Miller testified it was questionable whether impairment of cognitive functions would impact Spencer's ability to work in the cashier jobs, though he might not be able to do telephone soliciting.  [T. 66]

### Standard of Review

Judicial review of a final decision of the Commissioner is limited to determining whether substantial record evidence supports the Commissioner's factual findings, and whether such findings are reached through the application of correct law.  *Falco v. Shalala*, 27 F. 3d 160, 162 (5th Cir. 1994).  "Substantial evidence is such relevant as a reasonable mind might accept a adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).

In applying this standard, the Court reviews the entire record to determine whether substantial evidence supports the Commissioner's decision.  *Villa*, 895 F.2d at 1022.  Credibility and conflicts in the evidence are issues for resolution by the Commissioner, not the Court.  The

Court may neither substitute its judgment for that of the Commissioner nor re-weigh the record evidence. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000) [(quoting *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995) and citing *Johnson v. Bowen*, 864 F. 2d 340, 343-44 (5th Cir.1998)] (footnotes and quotation marks omitted); *Selders v. Sullivan*, 914 F. 2d 614, 617 (5th Cir. 1990). Factual findings supported by substantial record evidence are conclusive and must be upheld. *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000). Although the Court may reverse the Commissioner's decision if it is based upon faulty legal analysis, the Court should accept the Commissioner's legal conclusions if they are within reasonable meanings of the statutory or regulatory language. *Chevron, U.S.A., Inc. V. Natural Resources Defense Council*, 467 U.S. 837, 841-44 (1984). In the absence of a finding that the Commissioner applied an incorrect legal standard, or that the decision is unsupported by substantial evidence, the Court must affirm the Commissioner's determination. *Boyd*, 239 F.3d at 704.

## Burden of Proof

One claiming disability benefits bears the burden of proving a disability. 42 U.S.C. § 423(d)(5); 20 C.F.R. §416.912; *Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002); *Selders*, 914 F.2d at 618. Determination of a disability claim involves a five-step sequential evaluation process set out in 20 C.F.R. §416.920(a)(4)(i-v). Under that analysis, a claimant will not be found to be disabled if he is engaged in work that constitutes substantial gainful activity [step one, 20 C.F.R. §416.920(a)(I), and § 416.920(b)]; nor will he be held disabled unless he has a severe medically determinable physical or mental impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities for the duration requirement of 12 continuous months. Step 2, 20 C.F.R. §416.920(a)(ii) and § 416.920(c). A

claimant will be found to be disabled if he has an impairment or combination of impairments that meet or equal one of the listings in Appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement.  Step 3, 20 C.F.R. §416.920(a)(iii) and § 416.920(d).  If, after considering the assessment of claimant's residual functional capacity and past relevant work, it is determined that he can still perform past relevant work, he will not be found disabled.  Step 4, 20 C.F.R. §416.920(a)(iv) and § 416.920(f).  If, after considering the assessment of the claimant's residual functional capacity, age, education, and work experience, the Commissioner finds that the claimant can do alternative jobs, the claimant will not be held disabled.  Step 5, 20 C.F.R. §416.920(a)(v) and § 416.920(g).  The claimant bears the burden of proof on the first four steps in the disability evaluation process.  If the inquiry proceeds past that point, the burden shifts to the Commissioner on the fifth step.  *Masterson,* 309 F.3d at 272.

**DISCUSSION**

Following the sequential evaluation process, Administrative Judge Weakley found Spencer had not performed any substantial gainful activity since September 19, 1998; that Spencer's adjustment disorder was not severe; but that he did have severe impairments of degenerative disc disease, degenerative disease of the right knee and status post carpal tunnel surgery, although these impairments did not meet or equal any impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Judge Weakley assessed Spencer's residual functional capacity, concluding that Spencer was able to perform sedentary work with no prolonged sitting, standing or walking, and no bending or kneeling.  Judge Weakley found Spencer could not return to his past relevant work, but could perform other work existing in significant numbers in the national economy, thus he was not disabled as defined by the Social Security Act.

Judge Weakley found Spencer's allegations as to the severity of his impairments, pain and functional limitations not wholly credible or consistent with the medical evidence. The Court finds substantial evidence to support this finding. For example, although he complained of disabling pain, Spencer presented to various doctors on numerous occasions "in no acute distress."[4]  He was on no medications on November 6, 1998, November 29, 1999, or January 22, 2002. [T. 120, 142, 183]  Spencer reported on January 4, 1999, that his leg pain had been gone for about a month, that it recurred with lifting, but then resolved with limited activity and he remained able to use his leisure time "doing what [he] wanted." [T. 135]  He was having no difficulty with daily activities around January 8, 1999. [T. 124]  Although he claimed he could not do yard work, medical records show Spencer was able to "piddle around in the yard" around August 21, 2001 [T. 213], to work a lot in his yard in April 2002, and on a weekend in May 2002, to put in three raised gardens at his home. [T. 174-175, 171]

Spencer's contention that the Commissioner failed to properly consider and evaluate his complaints of pain and mental impairments is not borne out by the record. At the hearing, Judge Weakley specifically inquired about the location and severity of Spencer's pain, his problems after the injury, what daily activities he could perform, and the amount of weight he could lift before experiencing pain. [T. 48, 51-56].  Judge Weakley repeatedly noted Spencer's complaints of pain to various medical providers. The Judge's assessment of Spencer's lack of credibility on this issue is amply demonstrated in the record. Furthermore, Spencer has failed to prove that his pain has been "constant, unremitting and wholly unresponsive to therapeutic treatment." *Wren v.*

---

[4]For example, on November 6, 1998, January 4, 1999, November 29, 1999 and September 12, 2000 and February 21, 2001. [T. 121, 136, 142, 157 and 156]

*Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).  Less than two months after his purportedly totally disabling injury, Spencer was not even taking pain medications.  [T. 120, 142]  Less than three months after the injury, his leg pain was gone, and he continued to improve with treatment.

Judge Weakley also considered Spencer's adjustment disorder, which was associated with his pain disorder, and found it not severe because it did not significantly interfere with his ability to work.  Dr. Cole treated Spencer for two months for this disorder, taught him the basics of pain psychology, diaphragmatic breathing and autogenic relaxation, which led to Spencer's reporting he had almost no pain and significant tension reduction.  Spencer further stated stress had no effect on his pain and he had no sleep problems, and Dr. Cole stated Spencer need not return for further treatment.  [T. 258-260]  The record evidence supports Judge Weakley's finding that Spencer's adjustment disorder caused, at most, a mild impact on Spencer's work, and was therefore not severe under *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985).

Spencer has failed to show that the Administrative Judge did not fully consider his residual functional capacity in determining whether he was disabled.  The record evidence supports the finding that Spencer is able to perform a full range of sedentary work within the restrictions placed upon him.  The vocational expert established the availability of jobs within Spencer's limitations.  Spencer's contention that Judge Weakley was bound to accept Dr. Winters' opinion that he was "unable to return to work" or Dr. Steingard's opinion that he was "disabled" is misplaced, as neither of these opinions concerns specific limitations resulting from Spencer's impairments.  20 C.F.R. §404.1527(e).

As to Spencer's claim that his medication caused drowsiness, Judge Weakley's conclusion that this lacked credibility and did not significantly affect his ability to work is amply

15

supported by record evidence, *e.g.*, the absence of any such complaint to the myriad of doctors Spencer saw; his consistently being assessed by his medical care providers as alert, oriented and capable of understanding instructions; and his own testimony that he was capable of driving, performing personal care, household cleaning chores, pet care and cooking.

## RECOMMENDATION

Upon consideration of the pleadings, documents and evidence offered by the parties in support of their arguments, the record of the proceedings below, and the controlling law, the Court is of the opinion that the final decision rendered by the Commissioner is supported by substantial evidence and is in accord with relevant legal standards.  Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed, and that Spencer's motion to reverse, or in the alternative to remand, should be denied.

## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1,  any party who objects to this Recommendation must, within ten (10) days after being served a copy of the Recommendation, serve and file with the Clerk of Court his written objections to the Recommendation, with a copy to the District Judge, the U.S. Magistrate Judge and the opposing party.  A party filing objections must specifically identify those findings, conclusions and recommendations to which objections are being made; the District Court need not consider frivolous, conclusive or general objections.  A party's failure to file objections to the proposed findings, conclusions and recommendation contained in this report shall bar that party from a *de novo* determination by the District Court.  A party who fails to file written objections to the proposed findings, conclusions and Recommendation within ten (10) days after being served with a copy, shall be barred, except

16

upon the grounds of plain error, from attacking on appeal any proposed factual finding and legal conclusion accepted by the District Court to which the party did not object.  *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Signed this the 22nd day of August, 2007.

/s/ *Robert H. Walker*

ROBERT H. WALKER
UNITED STATES MAGISTRATE JUDGE

17